### HEIRS OF MULLANPHY v. SIMPSON.
### AND
### RUSSELL v. HEIRS OF MULLANPHY.

<div style="float:right">| 4 | 319 |<br>| 110 | 668 |</div>

1. Where a mortgagee, after taking the necessary steps pointed out by our statute, forecloses a mortgage, a purchaser under the foreclosure, takes the title, divested of all rights and interests derived from the mortgagor subsequent to the mortgage.
2. The act of 1807, which directs the "mortgagor, his heirs or representatives" to be summoned to appear &c. intended to embrace only those to whom the land would descend, or those who represent the personal fund out of which the redemption money would come, and does not require the mortgagee to notify subsequent incumbrancers.
3. Subsequent incumbrancers cannot be permitted to redeem a part, without paying the prior incumbrancer his whole demand.

It appears by the record that some time in the year 1817, Pascal Cerre, sold a lot or square of ground in the city of St. Louis, to one Thomas Hanly, for about the sum of $7,500, to secure the payment of which, Hanly executed a mortgage to Cerre, payable some time in the year 1823; that after the execution of this sale and mortgage, Hanly sold 35 feet fronting on main street, running back to the river 150 feet, to P. M. Dillon, and gave Dillon a deed therefor in general warranty, and to secure the payment of the price thereof, took a mortgage of Dillon. Dillon then sold all he purchased of Hanly to Rufus Easton; Easton then divided the same into two lots, calling that part fronting on main street, No. 1, and the part fronting on the river No. 2. Judgments were then obtained against Easton, and the lots were both sold on execution; Simpson became the purchaser of lot

<div style="float:right">Statement of the case.</div>

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

No. 1, but Mullanphy had previously purchased this same lot at sheriff's sale on an execution against Easton, issued on a younger judgment than that on which Simpson purchased, but the execution was older than that on which Simpson purchased. Wilson P. Hunt became the purchaser of lot No. 2, who after that sold it to Easton, who then sold both lots to W. Russell. Hanly had, before these sales, sold the mortgage given by Dillon to him, on both lots to Mullanphy.

It seems also, that Hanly and wife mortgaged the balance of the square to John Holmes and Andrew Elliot, to secure the payment of a large sum of money. While things stood in this situation, and before any payments were made on any of these mortgages, on the 17th of October, 1822, Simpson and Hunt filed a bill in chancery, against Hanly, Holmes and Elliott, and Mullanphy. The object of this bill, was to compel and restrain Mullanphy from proceeding to foreclose the mortgage Dillon had given to Hanly for the purchase money, as Mullanphy had become the purchaser, and as he was proceeding at law to obtain possession of the mortgaged premises; to restrain him from prosecuting his suit to gain possession on the forfeited mortgage, and to compel Hanly and Mullanphy to permit the complainants to redeem the mortgaged premises of lot No. 1 and 2, Mullanphy on his appearance filed a cross bill for a discovery.

On the 26th June 1826, William Russell and the complainants filed an amended bill against all the defendants, except Hanly, then dead, praying that they may have leave to redeem not only the lots No. 1 and 2, but the whole square; to this, Mullanphy answers, that Cerre had foreclosed his mortgage on the whole square, and that he had become the purchaser; and he also sets forth, that after the purchase on the foreclosure, he had taken an assignment of the original mortgage from Cerre. This is the principle state of the case.

<div align="center">B. ALLEN for appellant.</div>

Argument of
counsel for apt.

The questions to which the court have directed the attention of the counsel herein, are: 1. Whether Mullanpay's purchase under Cerre's foreclosure, does not overreach all intermediate rights and claims. 2. Whether the heirs or representatives who are to be summoned to answer, can be any other than those to whom the land would descend, or those who represent the personal fund out of which the redemption money is to come. 3. Admitting that the mortgagee under our statute, is as in

England, bound to proceed against the subsequent incumbrancers, will not the subsequent incumbrancer be compelled to pay the prior incumbrancer or his first mortgagee his whole demand, in order to entitle him to redeem a part of the mortgaged premises? As to the first point, the appellant insists that Mullanphy's purchase under Cerre's mortgage does overreach all intermediate rights and claims, and gives the following reasons:

1. That is the effect the plain import of the statute directing how mortgages should be foreclosed, would suggest, viz: that a foreclosure agreeably to the provisions of the statute, should be really a foreclosure, and vest the title in the purchaser under the foreclosure discharged of all rights and interests devised under the mortgagor subsequent to the mortgage. 2. That the foreclosure has been had agreeably to the uniform practice under the statute, from its enactment to the present day. 3. The consequent mischief of a different construction. 4. The contemporaneous exposition of the statute by the practice before the judges by whom it was enacted; it was passed in 1807, by the gov. and judges of the ter. of Loua. 5. According to the English law, the mortgagor, his heirs, exer's. assignees, subsequent incumbrancers and all persons claiming any interest whatsoever in the premises as against the mortgagor; tenants under mortgagor by statute, merchant staple, elegit, jointure, curtesy, dower; and the crown, or estates forfeited were necessarily to be made parties to a bill of foreclosure. It can hardly be pretended that in a proceeding to foreclose, instituted under the statute in 1808, the principles of the English law which was then no part of the law of this country would have been observed, or required to be observed, and if not, then no reason has intervened requiring their observance at the time of the proceedings of foreclosure instituted by Cerre 14th January 1823. The act of 1816, adopting the common law, adopts the same so far as it is not contrary to the laws of the territory &c. 6. Had a petition been filed against the mortgagor in his lifetime, that, under the statute, would have been sufficint without making any other person a party, even though there had been others deriving an interest under the mortgagor, and who according to the English equity system would have had to be made parties—and why? because the statute has so directed. This, supposing that the representatives as contemplated by the statute, were the alienees &c. of the land, it being in the alternative—Gey. dig. p. 307. 7. If the statute be in

JUNE TERM
1836.

Heirs of Mullay,
v.
Simpson,
and
Russell
v.
Heirs of Mullanphy.

Missouri Dec. 3
vol. p 492.

1 Ma. Ch. p 521.

Gey. Dig. p 124.

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

the alternative, the death of the mortgagor, could make no difference, one part of the alternative is satisfied. 8. The act of 1811, organising the court of chancery, does not change the mode of foreclosing a mortgage, because a remedy to foreclose already existed at law.

J. SPALDING, on the same side:

The first point to which the court directs the counsel on the rehearing is, whether Mullanphy's purchase under Cerre's foreclosure, overreaches all intermediate rights and claims. On this point, the defendants counsel hold the affirmative. 1. When the acts regulating the proceedings of foreclosure were passed in 1804 and 1807; (see Geyer's Digest, page 307, sections 1, 2, 3 and 4,) there was no distinction between equitable and legal titles and no proceedings in chancery; such distinctions and proceedings being peculiar to English law, and not known where the civil law is the basis of legislation, as in the Spanish laws, that mode of foreclosing, was the only one and bound every body. The proceedings against the mortgagor required by that act was a proceeding against the whole world as claiming under the mortgagor; and he was constituted the representative of the land, of all interest in it, for the purposes of enforcing the incumbrance. That act makes no provision for making subsequent alienees or incumbrancers parties. 2. There is no provision in the then law, for taking the account and apportioning the amounts to be paid by different alienees and incumbrancers of the mortgaged property; there was no chancery court or jurisdiction. 3. The case of mortgage was put by the law on the same footing with other incumbrances known to the law; for instance, judgments; in the case of judgments, it was neither then nor is it now, necessary to notify subsequent alienees and incumbrancers of the proceeding on the judgment to sell the land. An execution was sued against the judgment debtor alone, and the advertisement was merely that his interest in the land would be sold; or in cases where a year and a day had elapsed without execution, a scire facias issued on the judgment against him alone, or if dead, against his executors or administrators alone, and not against subsequent incumbrancers or alienees; nor was any notice in any manner required to be given to them. In this case, the defendant in the judgment, as in the case of a mortgage, the mortgagor represented the land incumbered and all interests and subdivisions of interest in it. And in both cases, all persons acquiring any interest in the land, were bound to

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

take notice of the incumbrance and of the fact that such
incumbrancer might sell the land without actual notice to
them. 4. If the legislative authority that made those enact-
ments regulating the foreclosure of mortgage, had intend-
ed that subsequent incumbrancers and alienees should be
notified in order to be bound. some provision to that
effect, would have been contained in the law. The very
subject was presented to that legislative authority and a
law was passed at that very time (1807) which shows
that it was not from ignorance or over sight that the act
on mortgages, says nothing of subsequent alienees and
incumbrancers; and it shows likewise, that the general
principles of law then in force, would not cause such an
interpretation of the mortgage act, as would require them
to be notified, in order to be bound by the foreclosure.—See
Geyer's Dig. page 264, sec. 59. This section provides,
in so many words, that in order to continue the lien of a
judgment, the subsequent alienees shall be notified. 5.
The act of Feb. 18, 1825, on mortgages (old rev. code,
593) is in its main features, the same as the old law. It
makes the mortgagor and the persons actually occupy-
ing the mortgaged land, the representatives of all the in-
terests in the land, for the purpose of foreclosure: and
expressly in sec. 7 makes the foreclosure and sale binding
on all persons; and although that act in sec. 4, permits
any person interested in the mortgaged premises, to ap-
pear as defendant and plead, yet it does not permit him
to appear for any purposes for which the bill was filed or
prosecuted in this writ, but confines him to pleading pay-
ment or satisfaction of part or the whole mortgage mon-
ey or any other lawful plea "in avoidance or bar of the
deed or debt," so that by the act of 1825, (a foreclosure
under which is expressly made final, and all persons claim-
ing interest might defend,) no person could set up the
matter charged in the bill in this case to delay or prevent
foreclosure, all that the sugsequent incumbrancer or alien-
ee could do, was to pay the money before the sale.—See
the provisions in section 6. 6th. If foreclosure does
not bind all, then a great portion of the mortgages fore-
closed under that law, are still redeemable, and estates
will be thrown into confusion. 7. The great number
of parties in chancery proceedings depends on the pe-
culiar maxims of equity courts. 8. But even on equity
principles, the complainants had no rights against the
mortgagee Cerre; he had clean hands and was no party
to the transfers or incumbrances, subsequent to his mort-
gage; none of them had any equity as against his full

June Term
1836.

Heirs of Mullan-
phy.
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

and speedy enforcement of his lien; all that they had a right to do was to pay him his money, which he would have been obliged to receive if tendered before the sale; but none of them ever tendered the money nor in their bill, neither in the original or supplemental bill, did they offer to pay it. The original bill shows merely a quarrel among the subsequent incumbrancers, with which Cerre had nothing to do, and which could not equitably interfere with his rights or delay his sale of the property under his mortgage for an hour. The complainants lay on their oars; never asked for Cerre to be compelled to receive the money from them; never tendered the money; never even asked to have the property subdivided and sold in parcels. If any other persons than a party to the suit, therefore, had bought at Cerre's sale, there could be no pretence that the complainants could redeem. But the fact that Mullanphy was a party to the suit, does not alter the case, Cerre undoubtedly had a general right to sell the property irredeemably; otherwise, he would have been perhaps deprived of the means of making his debt, if the bidders knew that the title which they were to buy was redeemable, they would not have bid. Cerre therefore, had a right to sell the property to as much advantage to himself as if there had been no suit pending.

But this right would have been infringed upon, if Mullanphy and others interested in the lot, could not have bid, so as to hold the property. Cerre in such case would have come into market with his property under the disadvantage that several of those most interested could not do so; at least could not acquire title by doing so. An anologous doctrine to this, is that the purchaser under judgment and executions, acquires all the right of the judgment creditor, in avoiding conveyances &c. intended to delay or defraud creditors.—2 J. C. R. 50. So here Cerre had the right by law, to sell an irredeemable estate in fee, and that right to exist effectually, must not be restricted to such persons as happen not to be litigating about the land.

Mullanphy holds under Cerre, whose right is paramount to all the titles set up in the bill. Suppose Cerre had bought in the property himself, according to complainants the land would still be redeemable, for Cerre was a party to the suit, and thus the foreclosure and sale would not alter the condition of the property; the consequence of which would be, that the pending of that dispute among subsequent incumbrancers, would have prevented Cerre's getting his money till this time. And

JUNE TERM 1836.

Heirs of Mullanphy
v.
Simpson, and Russell
v.
Heirs of Mullanphy.

thus, a dispute between subsequent incumbrancers as to which of them is bound to redeem a previous mortgage, and in what proportions between themselves, they are bound to contribute, prevents a foreclosure, till the termination of that controversy, and hold the innocent mortgagee out of his money till that event. Again, Cerre may be viewed as trustee—that is, the legal title was in him first, for the purpose of securing payment of his debt, and then reconveying the land or paying over the balance of proceeds of its sale to whoever was entitled. The law defines that trust, and points out a mode by which Cerre could extinguish the trust and convey the property freed from it absolutely, Cerre pursued that mode of extinguishing the trust and conveying the property, is that mode of extinguishing the trust prevented is the law, suspended by the fact, that he is a party to a suit in chancery, by subsequent incumbrancers, the object of whose bill, is to compel each other to pay Cerre; at the same time, there is in the bill no relief prayed against Cerre, and no allegation of any equity against him.

2. As to the construction of the act in making the parties to the foreclosure of mortgage after the mortgagor's death, I observe that the words used are: "Requiring the mortgagor, his heirs or representatives" to appear &c.; the words are coupled with the disjunctive particle, so that grammatically, the meaning is, not the mortgagor *and* his heirs or representatives, but the mortgagor *or* his heirs or representatives. Besides, there can be no heirs till the mortgagor is dead, which shows that those words must be of necessity in the disjunctive, the parties defendant must therefore, be the mortgagor or his heirs or his representatives; if the mortgagor is defendant he is alone; if the heirs are defendants, they are so alone, and if his representatives are made parties, they are so alone. This seems the plain and fair reading of the act. During the lifetime of the mortgagor, he only is required to be made defendant. Subsequent alienees and incumbrancers are obliged to watch any suit brought against him, but are not made parties. So after his death, his heirs are substituted in his stead to answer to the action of foreclosure; and other incumbrancers are not required to be made parties; and in default of heirs, his representatives occupy the same place, and as defendants in the foreclosure, represent all the interests in the land; what representatives are meant? Evidently, his personal representatives, so called; his executors and administrators, who are bound to pay the mortgage, as the mort-

42

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

gage is for a debt, and as both the heirs and personal representatives are interested to defeat all debts of the deceased. The law has provided in each of them, a defendant, who generally will defend and disprove the mortgage debt if possible. This, for all practical purposes was enough. The law did not intend nor attempt to compel the mortgagee to hunt out all the subsequent equities attaching on the land before he could raise the money out of the property; and as all that he could by law get, was the mortgage money and interest, it would have been unjust to impose that burden on him. It certainly would have been much more like equal justice, to require the subsequent incumbrancer, who with his eyes open, takes a lien on lands, bound to a prior creditor, to pay off alone or with the others interested, the debt for which the property was bound at first at his peril, when it became due. 3. As to the third point, submitted by the judges, I believe it is agreed that in redeeming, the subsequent incumbrancer or alienee, is bound to pay off the whole of the prior incumbrance; but in such case, even according to chancery law, such prior mortgagee cannot be delayed.—4 John. chy. reports, 77.

Opinion of the
court

Opinion delivered by McGirk J.*

No material point arises on the answers of the parties, the whole contest appears to be on the point of law whether the parties, complainants could on the hearing be allowed to redeem the whole square or any part thereof. By the original bill, no offer of any sort was ever made by the complainants to pay Mullanphy or Hanly any part of the money due on the Dillon mortgage; it appears to us that this ought to have been done, but the excuse the parties give at the bar in argument for not offering to do so, is that if they paid this money to Hanly, he was under no legal obligation to pass the same to Paschall Cerre, in part extinguishment of his mortgage, and if he did not then, before the title of complainants to lots 1 and 2, would be unincumbered, they would have to pay at least a proportionate part of the original purchase money to Cerre. It was therefore right in this case not to let Hanly get the money till the decree of the court should direct who should have it, and that as Mullanphy owned in part the Dillon debt by purchase from Hanly, and had taken the mortgage of Dillon for their security, it would not do to tender the money to him, if they did he would surely keep it, and the prior mortgage of Cerre would still have to be paid. These views are undoubted.

---

*Wash J. having been counsel in this case.

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

ly correct, in point of fact; but still they form no reason in equity, why Mullanphy should not, as assignee of Hanly, have the benefit of the contract his assignor had made with him. But if this view of this matter is entirely wrong, still we find there are other good reasons why the complainants ought not to recover; it will suffice.— Then comes the amended bill of the complainant with the additional one of William Russell, as purchaser under Easton, who after the purchase by Hunt, had re-bought of Hunt, one lot, and then Easton sold both to Russell, though one yet, as to him, remained in Simpson. Russell's right to lot No. 2 is the same Hunt's was to it before he sold to Easton. Let us now examine for a moment, the object of the amended bill. The object of this bill appears to be, to compel Holmes and Elliott to redeem three fourths of the square, or all conveyed by their mortgage from Hanly, or to let them do it and take the property; and the object of the amended bill, so far as Mullanphy is concerned, is to compel him to redeem both the Dillon lots, that is, to pay Cerre a proportionate part for these lots, or to let them do it and take the property; it is not very clear whether the bill intended also to redeem the mortgage of Dillon to Hanly, which money would of right go to Mullanphy. As to Cerre, the amended bill, asked nothing, but to answer to interrogatories; this bill did not seek to stay the hand of Cerre from proceeding at law to make his money out of the mortgaged property, nor indeed would it have been right to do so; but if the bill had offered to pay Cerre his whole debt, with interest and brought the money into court, before he had foreclosed, then the court would stay him for these complainants, and not before;—nothing short of this would satisfy the law as to Cerre. But nothing of this sort was done or offered to be done; there was therefore, no sort of equity in the whole bill as to him. But after this amended bill was filed, and before Mullanphy's answer thereto, Cerre foreclosed his mortgage on the whole square, and Mullanphy become the purchaser, for a large sum of money; he then answers and sets this purchase up;—and also, he took an assignment of the mortgage; he sets this up also, in defence of his claim to the Dillon lots.

On the hearing of the cause, the circut court dismissed the bill as to Hunt and Russell, and as to Simpson, the court decreed that he might redeem lot No. 1 of Mullanphy, without paying any part of the mortgage due from Hanly to Cerre. Russell appealed to reverse the judg-

JUNE TERM
1836.

Heirs of Mullanphy
v.
Simpson,
and
Russell
v.
Heirs of Mullanphy.

Where a mortgagee, after taking the necessary steps pointed out by our statute, forecloses a mortgage, a purchaser under the foreclosure takes the title divested of all rights and interests derived from the mortgagor subseqnent to the mortgage.

ment against him, and Mullanphy appealed to reverse Simpson's judgment.

This cause has been heretofore argued, and an opinion delivered, that Simpson's decree be reversed, and that, as to Russell be affirmed and now the cause is to be decided on the rehearing. The opinion heretofore delivered, turned on the point that the sale and purchase under Cerre's foreclosure overreaches all other titles, and that after this sale, it was entirely too late to stir any question as to the respective rights of sub-mortgagees and mortgagors. In granting a re-argument, this court put the argument on a few points. The first is, whether Mullanphy's purchase, under Cerre's forclosure does not overreach all intermediate rights and claims. 2. Whether the heirs or representatives who are to be summoned to answer, can be any other than those to whom the land would descend, or those who represent the personal fund out of which the redemption money is to come. 3. Admitting the mortgagee under our statute, is as in England, bound to proceed against incumbrancers, will not the subsequent incumbrancers be compelled to pay the prior incumbrancer his whole demand, in order to entitle him to redeem a part of the mortgaged premises? In order to dispose of these three points, we will consider the third and last immediately. The counsel for Simpson and Russell, do not in any way, deny the correctness of this position. We think according to equity, the first mortgagee is entitled to have all his money, and he cannot be compelled to take a part from one at one time, and a part from another at another time; yet the court decreed that Simpson might redeem as to lot No. 1.

Before we proceed with the other two points, we will remark, that one ground of argument, strongly relied on by the counsel for Russell, is, that if Russell had a right to redeem before Cerre foreclosed his mortgage, nothing that Cerre or Mullanphy could do, can impair or cut off that right, and they insist, he had the right to do so when the original and amended bills were filed. The counsel for Mullanphy, answers this argument by denying that there was any such right as to Cerre, without paymeut of the whole mortgage money first to him, and as this was neither done nor offered to be done, no such right existed; this, in our opinion, is a sufficient answer. It is also true as regards Mullanphy, before he became the purchaser of the paramount title, no offer was ever made to him of any money, before which time, he had a right to foreclose the mortgage against Dillon, and to buy in the same on

the foreclosure of Dillon's equity of redemption. We will examine these points no further; but will now proceed to examine the first point made and re-argued. The proposition is, did Mullanphy's purchase of the whole premises under Cerre's sale, vest in him a paramount title to the same premises? Upon the whole matter, we think the former opinion delivered by this court was correct, we will nevertheless, examine the reasons and arguments of counsel. It is admitted that if we had no statute on the subject of compelling satisfaction or payment of money due on mortgages, the complainants would, according to the course of chancery law, be entitled to redeem against all prior incumbrancers, provided he did not delay them in the collection of their debts, but to protect them he was obliged to offer the whole debt, and if refused, then to bring the money into court. None of these things were done in this case, but let us look at the matter as it stands on the record. While the subsequent parties were litigating among themselves, who should redeem and who should be compelled to redeem, no measures of any kind, were taken to prevent Cerre from foreclsoing his mortgage, and cutting off completely, all and every equity of redemption.

It is insisted by Messrs. Allen and Spalding, for Mullanphy, that the purchase under this sale, cuts off all farther enquiry arising out of titles erected and arising subsequent to Hanly's first mortgage to Cerre. On the other hand, Messrs. Gamble and Gyer for the complainants, attack the proceedings under Cerre's sale in several respects: 1st. They say it is void as to them, they not being made parties to it, and to sustain this doctrine, they invoke the rule of law, "that no man's interest can be affected or prejudiced, unless he be first called on to defend that interest,"—that Cerre never summoned them to shew cause why the mortgaged premises should not be sold to pay his debt, and that they being alienees, are representatives within the meaning of the statute, directing who should be summoned.

We will now turn to the statute in force when this sale took place. The act of 1807, says: "Any person holding an instrument in writing, purporting to be a mortgage on lands and tenaments, shall be permitted to sue out a petition to the circuit court of the county where the mortgaged property lies, stating in the same, the instrument of writing containing the mortgage, and requiring the mortgagor, his heirs or representatives to appear at the next succeeding court, to shew cause why

JUNE TERM
1836.

Heirs of Mullay.
v.
Simpson,
and
Russell
v.
Heirs of Mullanphy.

The act of 1807, which directs the "mortgagor, his heirs or representatives" to be summoned to appear &c. intended to embrace only those to whom the land would descend, or those

JUNE TERM.
1836.

Heirs of Mullanphy
v.
Simpson,
and
Russell
v.
Heirs of Mullanphy.

who represent the personal fund out of which the redemption money would come, and does not require the mortgagee to notify subsequent incumbrancers.

the mortgaged property should not be foreclosed and the property therein mentioned be sold for the payment of the debt due the petitioner." The act then provides the mode of service, and says if the defendant appears and files his answer, the cause shall proceed as ordinary cases at common law, and further provides, if there is no service, there shall be a publication &c. In this case, it is agreed Hanly was dead when the petition of Cerre was filed, and as to administrators, he had none, but had children and a widow. Whether these children were minors or not, does not appear; as far as recollected, the widow and children were named in the summons, were either served personally or served by a publication according to the act. When the mortgagor is alive, the law clearly requires he should be the only defendant. Now, although he may have sold all his equity of redemption, and there may be alienees, yet it is most certain he is to be the only defendant, for although the act says "the mortgagor, his heirs" shall be summoned, yet we know there can be no heir to him while he is alive, the disjunctive (or) must be understood as intended to come in between the word mortgagor and heirs; then that part of the statute will read, that when the mortgagor is alive, he alone is to be summoned, and when he is dead, his heirs stand next. In the first case, though he may have parted with all equity of redemption, yet he is by the statute competent to represent all interests arising under him. It will hardly be said in this case, the sale would be void as against the alienee; if it were so, the statute would be an entire nullity; it is the duty of all courts to give every statute effect, if it can be done; there seems to us to be no difficulty in this case to do so; when the mortgagor is summoned, he is to show cause why the mortgage is not to be foreclosed, and he is to show cause why the property is not to be sold to pay the debt. If he cannot do this, the act clearly directs a decree for the sale of the property to be made, but it says nothing as to the effect of the decree, nor of the sale; most certain the sale is to have some effect. The legislature seems to think the equity of redemption, would by the sale, be foreclosed, for they say the defendant is to shew cause why the mortgaged property is not to be foreclosed and the property sold to pay the debt. If they contemplated these effects, and I think it certain they did, how can it be done, unless the courts hold the purchaser, takes the property free from all equity of redemption, for otherwise no one would purchase. From this view of the statute, we conclude,

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

that when the mortgagor is alive, he alone is to be summoned, and when the property is decreed to be sold and is sold; the equity of redemption is barred and foreclosed against all who in any way make title through him after the mortgage was made, and that the purchaser has all the title in him, that the mortgagor had when he made the mortgage, notwithstanding the mortgagor may have alienated the equity of redemption. But we are told if this be the law, it will work great injustice; a fraudulent mortgagor may never let his alienee know suit is brought against him; the rights of the alinee would be destroyed, by a decree and sale, to which he was no party, and of which, he had no notice; and then the question is asked, can a man be bound by a judgment, to which he was not a party, and of which he had no notice? One answer to this is, that if a man will buy a thing after it is in suit, and a judgment is rendered against his alienor, he will be bound by that judgment unless he can make a title beyond the judgment, or demand it in some other way, the subsequent mortgagee is in no better condition; he bought with the evidence of a lien before his eyes, he bought well knowing if the debt were not paid, the land would be sold to pay the debt; and also, with a full knowledge, that when suit is brought, if the mortgagor be living, he alone is to be the defendant, where then is the great injustice to him? What great principle of law is violated? None as we believe, but in looking at hardships, we ought to look at both sides. Now let it be remembered, the first mortgagee made no bargain with him, he only bargained with the first mortgagor. The interest or supposed interest of the party, made him become a party in interest under the mortgagor, he buys the mortgagor's equity of redemption, and demands of the mortgagee that in future he is to be hunted out and called on when the debt is wanted. By this, a hardship and burden is imposed on the creditor; he is to hunt out all subsequent purchasers of the equity of redemption, though there should be a hundred, make them parties at his peril; and then all the costs, as to all, are first to be deducted from the sale money, then he gets the balance, if any. And indeed, cases may exist, where all interested in the equity of redemption could never be got in a condition to be named in the summons. Suppose the case of mortgaged land laid off in town lots, and descents cast on descents, then the equity of redemption could never be foreclosed, by sale or otherwise; and for all this embarrassment, expense, vexation and delay, the creditor

JUNE TERM
1836.

Heirs of Mullan-
phy.
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

Subsequent in-
cumbrancers can-
not be permitted
to redeem a part,
without paying
the prior incum-
brancer his whole
demand.

gets no more than his money and interest, if the land will sell for so much. These are a part of the evils of the British system of foreclosing equities of redemption. We really believe the legislature that passed the act of 1807, intended, and did cut these evils up by the roots; for it will not be denied that it would be a great evil to have suits about the equity of redemption, in courts of chancery an hundred years old, and them undetermined, and the parties multiplied in number to at least a battalion. Such things exist in England, to the great disgrace of jurisprudence, and to the great damage of some of the parties. All this is to be endured, for the benefit of under purchasers of equities of redemption. In the case under consideration, it is said if the under purchasers are not summoned they are to be injured without relief or the means of relief. The answer to this is first, that when they purchase, it is for them to consider whether they can watch the motions of the mortgagee, whether the mortgagor will pay the debt, when due, and if the debt be not paid, they must consider whether they will step forward and pay it and save a foreclosure. If they cannot undertake this, they ought not to buy, if they do buy they ought to be holden to have undertaken. Besides this, they ought to watch and see if the creditor is about to foreclose the mortgage, for I think it is quite as just to require them to look after the motions of the creditors, as to require the creditors to enquire from time to time who are the holders of equity of redemption, and may be interested, tender and pay the debt, and after the decree, the alienee may pay the money to the sheriff or the party and if refused, then he might well restrain by injunction, all further proceedings, so that we can discover the law has not left his interests entirely to perish, if he will himself look to them.

Thus I understand the law and justice of the case when the mortgagor is alive, and if he be dead and has in fact sold his equity of redemption, still why should the creditor be required to search for under purchasers. The heir is the next man in law, as to land after the ancestor. The wording of this statute is remarkably calculated to induce the belief that the legislature never once thought of the alienee; if they at all intended to make him a defendant he might well have been mentioned in the conjunction with the mortgagor, and if they intended he should be a defendant, a most fit occasion occurred when they were speaking of the heirs, yet no mention is made of him. I suppose the legislature first

intend the ancestor should be defendant, and in default of him, then the heir, as the next person most likely to have an interest in the land, and in default of him, then the executor or administrator. It mentions the representatives as being competent defendants: it may be there are heirs and also executors or administrator, and when this occurs, the heirs are to be prefered as being first named; and when this does not occur, the executors or administrators are next in order. This is what I think the legislature intended, and if they did intend this, the effect of the decree and sale must be the same, whether the one or the other was defendant.

. But it is argued that representative means alienee, as well as executor or heir, and that when the word occurs in a statute, it is to be understood in reference to the subject matter it is mentioned with or related to. I see no objection to this rule. A case has been cited by counsel, from 2 Dal. R. 250, to sustain this doctrine, by the report it appears, that by an act of the general assembly of Pennsylvania, the pre-emption to certain lands was secured to certain settlers and their legal representatives, the administrator's alienee and the alienee of the heir, both claimed the pre-emption; the court held the words, legal representatives, must be understood in relation to the thing to be holden, to ascertain whether the personal or real representatives were intended, and decided in favor of the heir. This case is referred to, to shew that the alienee of an equity of redemption, is to be prefered as defendant to the executor or administrator; this may possibly be what the legislature intended, and may be most for the interest of alienees to so understand it; but yet, I hold that where there is an heir, neither the alienee nor executor or administrator, can be preferred to him as defendant; but yet, it seems to me, the legislature inteded by the word representative to indicate the person who might have the funds of the mortgagor in his hands, the mortgage debt might be well chargable on the personalty of the mortgagor, as in most cases such debt is charged not only on the mortgaged property, but on the personalty also, and all other effects of the mortgagor; when this is the case, the debt ought to be paid by the executor out of such funds, if the debt had in fact been paid, the executor could best defend that matter.

It is believed the foregoing disposition of the case, disposes of all other questions made in argument. The judgment and decree of the court below, as to Russell, is affirmed, and the decree made as to Simpson, is reversed,

JUNE TERM
1836.

Heirs of Mullanphy
v.
Simpson,
and
Russell
v.
Heirs of Mullanphy.

43

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

Separate opinion
op Judge Tomp-
kins.

and that so much of the bill as regards the interest of Simpson, be dismissed by this court.

TOMPKINS, J:—

The statement of the case being made by the presiding judge, it becomes useless to state it again. It may not be improper to remark, that at common law, when one mortgaged land to secure the payment of money, if it was not paid at the time limited in the mortgage, the land became forfeited to the person to whom the money was due. The courts of chancery at an early period of the legal history of England, interposed to prevent a forfeiture, and as land was most commonly mortgaged for sums of money far below its value, it was not unfrequently mortgaged a second time; the mortgagee then was by these courts, required to summon not only the mortgagor, but also the subsequent incumbrancer, to show cause why the mortged premises should not be forfeited; and either of the parties was allowed to pay the mortgagee his money and redeem the land. Thence grew up all the learning on mortgages. In the year 1807, our territorial legislature took up the subject, and required that any person holding an instrument of writing, purporting to be a mortgage on lands and tenements, shall be permitted to sue out a petition to the court of common pleas, of the district where the mortgaged property lies, stating in the same, the instrument of writing containing the mortgage, and requiring the mortgagor, his heirs or representatives, to appear at the next succeeding court, to show cause why the mortgaged property should not be foreclosed, and the property therein mentioned sold for the payment of the debt due the petitioner. It was then made the duty of the court, when entering a decree for the sale of the mortgaged premises to postpone the sale to a day at least nine months distant from the time of filing the petition; within which period, the mortgagor might, on the payment of the debt, interest and costs, redeem the property. The mortgagee then, after recording his mortgage, was in a condition not quite so good as a judgment creditor, his demand must still be proved in a court, but the mortgage was as well as the judgment, a lien only for the principal and interest, no forfeitures could accrue to raise in a court of equity, an obligation on him to search out for persons who might possibly or even probably lose by the sale of the mortgaged property to satisfy his debt. If any person take a mortgage on the land later than his, or even took it by absolute sale it

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

was his own voluntary act, and it is difficult to see how such alienee or subsequent incumbrancer, could by his own act impose on the first mortgagee the duty of taking care of his interests by summoning him to show cause why the mortgaged property should not, in the language of the act, be foreclosed, and the property therein mentioned, sold for the payment of the debt due the petitioner, and thereby giving him an opportunity to secure the residue after the first mortgagor may have received his dues; for it is one of the first principles of law, that one shall not require another to perform a duty without a compensation; but what construction then, are we to put on the word representative, used in the act, where the mortgagee is required to summon the heirs or representatives? To my mind, no difficulty presents itself; here there is enough for the word representative to operate on, without subjecting the first mortgagee to be driven in pursuit of defendants, whithersoever the interests of the mortgagor or the convenience of his alienees or subsequent incumbrancers may require. Every man when he takes a mortgage, knows that the mortgagor may die; thence arises an implied duty, to summon his heirs or the persons who may represent him, to pay the debt secured on the mortgaged premises, that is to say, his executors or administrators. The word representative, is not a technical word, and must be construed according to the subject matter treated of in the act. The persons standing here as alienees of the mortgagor, or mortgagors, become so by their own voluntary act, and thereby acquired no claims on the mortgagee Cerre, or on Mullanphy, the purchaser of the mortgaged premises, and assignee of Cerre's mortgage; it was Cerre's right as mortgagee of the whole, and Mullanphy's right, as mortgagee of a part, to have the mortgaged premises sold to satisfy their debts; and it would be a violation of the first principles of justice to suffer a subsequent purchaser to come in voluntarily to weaken the security they had taken; but it is said they are now willing to pay the whole debt and damages. Had the property in question, fallen in value, below what it was when Mullanphy purchased, and when it did not bring enough to pay the money it was bound to secure, Mullanphy could not have compelled them to pay what he wanted of his debt, nor could he have taken one cent more than was due on his contract. But we are told that the residue, if it had been sold for more, might have been paid over to the mortgagor; and the alienees or subsequent incumbrancers might never be able to recover a

JUNE TERM
1836.

Heirs of Mullan-
phy
v.
Simpson,
and
Russell
v.
Heirs of Mullan-
phy.

cent from an insolvent mortgagor; and a case is cited from New York, in which chancellor Kent decides, that for such reason, the subsequent incumbrancer ought to be summoned. The high authority of that chancellor's name aside, I think it a very weak reason; these subsequent incumbrancers in the case of a mortgage, had no claim on the prior incumbrancer to constitute him the guardian of their rights, when he had no right to take the land by forfeiture. The case cited from Dallas, so far from aiding the cause for which it was cited, appears to me to be very strong against it. By an act of the assembly, says the Reporter, the right of pre-emption to lands lying between Lycoming creek on the East and Pine creek, on the west &c. was secured to certain settlers, or their legal representatives. A person by the name of Campbell being a settler within the description of the act, died in 1781, three years before the act was passed. The question to be decided, was whether the rights of pre-emption, granted in the terms of the act, should vest in the real, or the personal representatives of the grantee. After argument, the court were of opinion, that by the words, "legal representatives," heirs or alienees were to be understood; for though the question might in the abstract appear equivocal and ambiguous, it was explained by the subject matter, and land *ex vi termini,* importing real estate, the legal representative must in legal contemplation be the heir, not the administrator.— See 2 Dallas, 205, Duncan v. Walker. In the case before this court, Mullanphy and Cerre were each in pursuit of the money due them from the mortgagors, and neither of them by the proceeding, prescribed by law, have obtained the land, unless they become the purchasers. The representative then of the mortgagor who was liable to pay his debts, was the representative whom the mortgagee was bound by the statute, to pursue and summon. But admitting for argument's sake, that this construction is wrong, still the statute is satisfied; for it requires the petitioner to summon only the heirs or representatives, and he has summoned the heirs, thereby satisfying the law, for he is not required to summon both. But I am decidedly of opinion that the act of assembly never contemplated so unjust a thing, as to impose on the mortgagee, the duty of looking to the interests of those who might subsequently contract with the mortgagor about the mortgaged premises. In the revised code of 1825, when the subject of mortgages was again taken up, and more explicit language used, not one word is said of the

alienees of the mortgagor; but the mortgagee is required to proceed against the mortgagor or his heirs and executors or administrators, and the tenants or occupiers of the mortgaged premises. It is apparent that the legislature wished to take the whole business of foreclosing mortgages out of the hands of the chancery courts. The duties then imposed on the mortgagee by those courts in consequence of the forfeiture of the land by the mortgagor, ought to cease when the the mortgagee's right to acquire by forfeiture was taken away by the legislature. A distinguished author tells us that formerly, the members of the French parliaments, met armed, and decided almost all cases of importance by the sword. In subsequent ages, it was found out that cases might be better decided in another way; and without any law to that effect, the members of the French parliaments, by the mere power of custom, lost the long cherished privilege of deciding causes by battle. Our legislative bodies have willed that mortgaged premises shall no longer be forfeited for a failure on the part of the mortgagor to pay the money, secured by the mortgage. It is the duty then of the courts, no longer to impose on mortgagees the heavy duties which the courts of chancery formerly imposed to prevent a forfeiture; and this duty of the courts is imperative, as the legislature have not required of mortgagees the performance of such duties. For the reasons above given, I concur in opinion with the president of the court.